UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2019 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 2 0 C R 0 0 1 2 5 - JFW |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 371: Conspiracy; 21 U.S.C. §§ 331(d), 355(a), and 333(a)(2): Introducing Unapproved New Drug Into Interstate Commerce with Intent to Defraud; 18 U.S.C. § 545: Importing Merchandise Contrary to Law; 18 U.S.C. § 554: Exporting Merchandise Contrary to Law] |
| LANCE L. GOOBERMAN and SUSAN TICKNER, | |
| Defendants. | |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

A.  DEFENDANTS AND CO-CONSPIRATORS

1.   Defendant LANCE L. GOOBERMAN was a medical doctor who owned and operated various business entities in New Jersey, including a medical practice.

2.   Defendant SUSAN TICKNER was an assistant to defendant GOOBERMAN at the medical practice in New Jersey.

3.   Co-Conspirator 1 was a medical doctor in Hong Kong who owned and operated several business entities in Hong Kong.

4.   Co-Conspirators 2 and 4 were individuals who worked for a pharmacy/shipping company located in Hong Kong where Co-Conspirators 2 and 4 would store and ship implantable naltrexone pellets and liquid naltrexone on behalf of Co-Conspirator 1.

5.   Co-Conspirator 3 resided in various locations at different times, including Minnesota, Pennsylvania, and the United Kingdom.

B.   STATUTORY AND REGULATORY BACKGROUND

6.   The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq. ("FDCA"), regulated the manufacture, labeling, and distribution of all drugs shipped or received in interstate commerce, including the distribution of prescription drugs.

7.   A "drug" was defined by the FDCA as, among other things, articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; articles (other than food) intended to affect the structure or any function of the body of man or other animals; and articles intended for use as a component of any such articles.

8.   A "new drug" was defined by the FDCA as "any drug . . . not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof . . . ."

9.   Under the FDCA, drugs that may only be dispensed upon a written prescription of a licensed practitioner included any "drug intended for use by man which because of its toxicity or other potentiality for harmful effect, or the method of its use, or the

1    collateral measures necessary to its use, is not safe except under

2    the supervision of a practitioner licensed by law to administer such

3    drug."  A drug could also be limited to prescription use by an

4    application approved by the U.S. Food and Drug Administration

5    ("FDA").

6        10.  A "new drug" could not be introduced or delivered for

7    introduction into interstate commerce unless the FDA had approved a

8    New Drug Application ("NDA") or an Abbreviated New Drug Application

9    ("ANDA") with respect to the drug, or it qualified for an exemption

10   as an Investigational New Drug.  The manufacturer of a new drug was

11   required to submit information in the NDA or ANDA showing to the

12   FDA's satisfaction that its new drug was safe and effective for its

13   intended use.

14       11.  A drug was deemed to be "misbranded" if it did not meet

15   certain requirements of the statute, including, among other things:

16   (1) if its labeling was false or misleading in any particular; (2) if

17   in a package form unless it bore a label containing the name and

18   place of business of the manufacturer, packer, or distributor; (3) if

19   its labeling failed to bear adequate directions for use; or (4) if,

20   among other things, a drug came from a foreign drug establishment and

21   the drug was not annually listed with the FDA by that establishment

22   as one of the drugs which was being manufactured for commercial

23   distribution in the United States.  In the case of a prescription

24   drug, a drug was also misbranded if its label failed to bear the

25   symbol "Rx only."

26       12.  The FDCA prohibited the introduction, or causing the

27   introduction, of misbranded drugs and unapproved new drugs into

28   interstate commerce.

13.   Naltrexone was a prescription drug used to treat opioid addiction.  A naltrexone pellet was a drug that contained the active pharmaceutical ingredient ("API") naltrexone that was surgically implanted into a patient so that it could dissolve and release the API over a specified period of time.  Liquid naltrexone was a drug that contained the API naltrexone that was injected into a patient and would release the naltrexone over a specified period of time.

14.   Defendants GOOBERMAN and TICKNER would manufacture and/or oversee the manufacture of naltrexone pellets and liquid naltrexone, which each constituted a drug, a prescription drug, a new drug, and an unapproved new drug under the FDCA.

15.   The Harmonized Tariff Schedule of the United States Annotated ("HTSA") provided basic tariff rates and categories for all merchandise imported into the United States.

16.   Disulfiram was a prescription drug used to treat alcohol and cocaine addiction.  A disulfiram pellet was a drug that contained the API disulfiram that was surgically implanted into a patient so that it could dissolve and release the API over a specified period of time.  Liquid disulfiram was a drug that contained the API disulfiram that was injected into a patient and would release the disulfiram over a specified period of time.

17.   Disulfiram pellet and liquid disulfiram each constituted a drug, a prescription drug, a new drug, and an unapproved new drug under the FDCA.

18.   These Introductory Allegations are incorporated into each count of this Indictment.

COUNT ONE

[18 U.S.C. § 371]

[ALL DEFENDANTS]

A.   OBJECTS OF THE CONSPIRACY

19.   Beginning on an unknown date and continuing through in or about April 2018, in Los Angeles, Orange, and Riverside Counties, within the Central District of California, and elsewhere, defendants GOOBERMAN and TICKNER, Co-Conspirators 1, 2, 3, and 4, and others known and unknown to the Grand Jury, conspired with each other to:

a.   knowingly and fraudulently import and bring merchandise, namely, naltrexone pellets and liquid naltrexone (also collectively referred to as "naltrexone products"), into the United States contrary to law, in violation of Title 18, United States Code, Section 545;

b.   introduce, with the intent to defraud, a misbranded drug, namely, naltrexone products, into interstate commerce, in violation of Title 21, United States Code, Sections 331(a), 352, 353(b)(4), and 333(a)(2);

c.   introduce, with the intent to defraud, an unapproved, new drug, namely, naltrexone products, into interstate commerce, in violation of Title 21, United States Code, Sections 331(d), 355(a), and 333(a)(2); and

d.   knowingly and fraudulently export and send from the United States merchandise, namely, naltrexone products, in violation of Title 18, United States Code, Section 554.

B.   MANNER AND MEANS OF THE CONSPIRACY

20.   The objects of the conspiracy were carried out, and were to be carried out, in substance as follows:

5

a.     Co-Conspirator 1, through a business he operated in Hong Kong, would knowingly import into the United States contrary to law naltrexone products that were not FDA-approved for surgery centers and addiction treatment centers to use in opioid-addicted patients.

b.     Defendant GOOBERMAN would refer to Co-Conspirator 1 customer surgery centers, addiction treatment centers, and physicians in the United States and elsewhere ("Customer Clinics") who sought to purchase naltrexone pellets and/or liquid naltrexone.

c.     Co-Conspirator 1 would obtain naltrexone products from defendant GOOBERMAN, defendant TICKNER, Co-Conspirator 3, and other co-conspirators, and would then store the naltrexone products at the facility in Hong Kong where Co-Conspirators 2 and 4 worked.

d.     The naltrexone products obtained from defendants GOOBERMAN and TICKNER did not bear any labels that: (1) identified the contents of the naltrexone products; (2) identified the name and place of business of the manufacturer, packer, or distributor; (3) provided directions for use; or (4) contained the symbol "Rx only."

e.     Co-Conspirators 2 and 4 would prepare labels for the packages of naltrexone pellets and/or bottles of liquid naltrexone for Co-Conspirator 1's approval, then affix the approved labels to the packages and/or bottles.

f.     Co-Conspirator 1 would use email and/or telephone to communicate with the Customer Clinics seeking to purchase naltrexone products and to facilitate the sale of naltrexone products to Customer Clinics.

g. After receiving payment from the Customer Clinics for orders of naltrexone products, Co-Conspirator 1 would provide instructions to Co-Conspirators 2 and/or 4 for shipping the naltrexone products to the Customer Clinics.

h. In order to avoid detection by United States customs authorities, Co-Conspirators 2 or 4 would ship the naltrexone products from Hong Kong to Customer Clinics in the United States using false HTSA codes and the description "plastic beads in plastic tubes" or "small glass bottles" per Co-Conspirator 1's instructions.

i. The naltrexone products shipped to the United States by Co-Conspirators 1, 2, and 4: (1) contained false and misleading labels that identified an ingredient that was not contained in the naltrexone products and omitted an ingredient that was in the naltrexone products; (2) did not have labels that identified the name and place of business of the manufacturer, packer, or distributor; (3) did not have labels that bore adequate directions for use; and (4) did not have labels that bore the symbol "Rx only." Moreover, the naltrexone products were not listed with the FDA by either Co-Conspirator 1 or the Hong Kong pharmacy/shipping company used by Co-Conspirator 1 to store the naltrexone products as drugs that were being manufactured for commercial distribution in the United States.

j. Co-Conspirator 1 would pay defendants GOOBERMAN and TICKNER for all naltrexone products that were received from defendants GOOBERMAN and TICKNER and sold to the Customer Clinics.

C. OVERT ACTS

21. On or about the following dates, in furtherance of the conspiracy and to accomplish its objects, defendants GOOBERMAN and TICKNER, Co-Conspirator 1, Co-Conspirator 2, Co-Conspirator 3, Co-

1   Conspirator 4, and other co-conspirators known and unknown to the

2   Grand Jury, committed, and willfully caused others to commit, various

3   overt acts within the Central District of California and elsewhere,

4   including, but not limited to, the following:

5   Delivery of Naltrexone Products in April 2014

6       Overt Act No. 1:    On or about March 21, 2014, Co-Conspirator 1

7   emailed defendants GOOBERMAN and TICKNER to request that 1,250

8   naltrexone pellets be sent to a hotel in Orlando, Florida, by April

9   10, 2014, so that Co-Conspirator 1 could pick them up during Co-

10  Conspirator 1's visit to Orlando.

11      Overt Act No. 2:    On or about April 2, 2014, Co-Conspirator 1

12  emailed defendants GOOBERMAN and TICKNER to request that liquid

13  naltrexone be added to Co-Conspirator 1's request for naltrexone

14  pellets.

15      Overt Act No. 3:    On or about April 7, 2014, Co-Conspirator 1

16  emailed TICKNER to inform him that Co-Conspirator 1 was bringing

17  three suitcases to the United States, two of which were "just for the

18  implants and injections."

19      Overt Act No. 4:    On or about April 7, 2014, defendant TICKNER

20  emailed Co-Conspirator 1 and confirmed that defendant TICKNER would

21  send 1,050 naltrexone pellets, 500 units of liquid naltrexone, and

22  liquid disulfiram.

23      Overt Act No. 5:    On or about April 8, 2014, defendant TICKNER

24  emailed Co-Conspirator 1 and provided the dimensions and weights of

25  four boxes that would be shipped to Co-Conspirator 1 in Orlando,

26  Florida.

27

28

Overt Act No. 6:   On or about April 10, 2014, defendant TICKNER shipped four boxes containing naltrexone products and liquid disulfiram to a hotel for Co-Conspirator 1 to pick up.

Overt Act No. 7:   On or about April 13, 2014, Co-Conspirator 1 departed the United States on a flight bound for Hong Kong with naltrexone products and liquid disulfiram.

Delivery of Naltrexone Pellets in September 2014

Overt Act No. 8:   On or about September 24, 2014, Co-Conspirator 1 emailed defendants GOOBERMAN and TICKNER to request that 500 naltrexone pellets be sent to Co-Conspirator 1's attention at an address in Wayzata, Minnesota.

Overt Act No. 9:   On or about September 26, 2014, Co-Conspirator 1 received 500 naltrexone pellets that were mailed to him in Wayzata, Minnesota, by defendants GOOBERMAN and TICKNER.

Overt Act No. 10:   On or about September 29, 2014, Co-Conspirator 1 departed the United States on a flight bound for London with naltrexone pellets.

December 2014 Order of Naltrexone Pellets by Customer Clinic 1 – Invoice No. 20140109

Overt Act No. 11:   On or about December 5, 2014, after receiving an email from an executive at Customer Clinic 1 which indicated that he had been referred to Co-Conspirator 1 by defendant GOOBERMAN regarding his interest in purchasing naltrexone pellets, Co-Conspirator 1 emailed an executive of Customer Clinic 1 a price list for purchasing naltrexone pellets.

Overt Act No. 12:   On or about December 23, 2014, Co-Conspirator 1 emailed an executive of Customer Clinic 1 to confirm

that the payment had been processed for the order of naltrexone pellets referenced on Invoice No. 20140109.

Overt Act No. 13:   On or about December 23, 2014, Co-Conspirator 1 emailed Co-Conspirator 2 with instructions to ship four naltrexone pellets referenced on Invoice No. 20140109 to Customer Clinic 1.

Overt Act No. 14:   On or about December 23, 2014, Co-Conspirator 2 shipped four naltrexone pellets, described as "Plastic Beads in Plastic Tubes" with HTSA code "39172200," to Customer Clinic 1 in Corona del Mar, California.

Receipt of Payment for November 2014, December 2014, January 2015, and February 2015 Sales

Overt Act No. 15:   On or about January 7, 2015, defendant TICKNER emailed Co-Conspirator 1, stating that defendants GOOBERMAN and TICKNER needed to receive some royalty payments for naltrexone pellets.

Overt Act No. 16:   On or about January 26, 2015, Co-Conspirator 1 emailed defendants GOOBERMAN and TICKNER, stating that the total amount of his sales of naltrexone and disulfiram pellets for November and December 2014 was $5,765 and authorizing defendants GOOBERMAN and TICKNER to charge Co-Conspirator 1's credit card $5,765 for the naltrexone and disulfiram pellets that Co-Conspirator 1 sold to customers.

Overt Act No. 17:   On or about February 27, 2015, Co-Conspirator 1 emailed defendant TICKNER, stating that Co-Conspirator 1 had a new credit card for defendant TICKNER, that Co-Conspirator 1 would provide the new credit card later that day, and that Co-

1    Conspirator 1 would pay for Co-Conspirator 1's January 2015 sales in

2    addition to Co-Conspirator 1's November and December 2014 sales.

3        Overt Act No. 18:   On or about March 17, 2015, defendant

4    TICKNER emailed Co-Conspirator 1 with the subject heading, "Have you

5    forgotten me?"

6        Overt Act No. 19:   On or about March 20, 2015, Co-Conspirator 1

7    emailed defendants GOOBERMAN and TICKNER a summary of his sales

8    during the months of November 2014, December 2014, January 2015, and

9    February 2015 of naltrexone and disulfiram pellets obtained from

10   defendants GOOBERMAN and TICKNER, and authorized defendants GOOBERMAN

11   and TICKNER to charge Co-Conspirator 1's credit card $9,360 to pay

12   for the naltrexone and disulfiram pellets that Co-Conspirator 1 sold.

13       Overt Act No. 20:   On or about March 23, 2015, defendant

14   TICKNER emailed Co-Conspirator 1 a running inventory for the period

15   May 2008 to March 23, 2015, that reflected the naltrexone products

16   and disulfiram products that defendants GOOBERMAN and TICKNER had

17   provided to Co-Conspirator 1 as well as the amount of money Co-

18   Conspirator 1 had paid to defendants GOOBERMAN and TICKNER for the

19   naltrexone and disulfiram products that Co-Conspirator 1 sold.

20   March 2015 Order of Naltrexone Pellets by Customer Clinic 1 – Invoice

21   No. 20150014

22       Overt Act No. 21:   On or about March 5, 2015, in response to an

23   email asking for proof that the naltrexone pellets were FDA-approved,

24   Co-Conspirator 1 emailed an executive of Customer Clinic 1, stating,

25   "Oral Naltrexone is a registered product in USA.   None of the

26   Naltrexone implants are registered.   They are all compounded

27   products."

28

Overt Act No. 22:   On or about March 6, 2015, after receiving an order for naltrexone pellets from Customer Clinic 1, Co-Conspirator 1 emailed Co-Conspirator 2 with instructions to ship six naltrexone pellets referenced on Invoice No. 20150014 to Customer Clinic 1 and stated, "Please remember the harmonisation code."

Overt Act No. 23:   On or about March 6, 2015, Co-Conspirator 1 emailed an executive of Customer Clinic 1 to confirm that the payment had been processed for the order of naltrexone pellets and attached Invoice No. 20150014.

Overt Act No. 24:   On or about March 9, 2015, Co-Conspirator 2 shipped six naltrexone pellets, described as "Plastic Beads in Plastic Tubes" with HTSA code "39172200," to Customer Clinic 1 in Corona del Mar, California.

Receipt of Payment for March 2015 Sales

Overt Act No. 25:   On or about April 18, 2015, Co-Conspirator 1 emailed defendants GOOBERMAN and TICKNER a summary of his sales during the month of March 2015 of naltrexone and disulfiram pellets obtained from defendants GOOBERMAN and TICKNER, and Co-Conspirator 1 authorized defendants GOOBERMAN and TICKNER to charge Co-Conspirator 1's credit card $3,520 on Tuesday April 21, 2015, to pay for the naltrexone and disulfiram pellets that Co-Conspirator 1 sold.

Relationship Among Defendant GOOBERMAN, Co-Conspirator 1, and Customer Clinic 2

Overt Act No. 26:   On or about March 4, 2015, after receiving inquiries from Customer Clinic 2 about purchasing naltrexone pellets on defendant GOOBERMAN's referral, Co-Conspirator 1 emailed defendant GOOBERMAN and advised that Customer Clinic 2 was interested in buying naltrexone pellets "in 'significant numbers'."

Overt Act No. 27:   On or about March 4, 2015, Co-Conspirator 1 emailed executives of Customer Clinic 2 and defendant GOOBERMAN about finalizing "licensing arrangements" between Customer Clinic 2 and defendant GOOBERMAN so that Co-Conspirator 1 could send Customer Clinic 2 information to begin purchasing naltrexone pellets from Co-Conspirator 1.

Overt Act No. 28:   On or about March 5, 2015, Co-Conspirator 1 emailed executives of Customer Clinic 2 a price list for purchasing naltrexone pellets.

Overt Act No. 29:   On or about March 10, 2015, defendant GOOBERMAN emailed Co-Conspirator 1 and indicated that defendant GOOBERMAN was "very close to a deal" with Customer Clinic 2 and that defendant GOOBERMAN believed that he had "come to terms" with Customer Clinic 2.

Overt Act No. 30:   On or about March 19, 2015, defendant GOOBERMAN emailed Co-Conspirator 1 and stated that he was "about to sign an exclusive agreement" with Customer Clinic 2 for naltrexone pellets, that Co-Conspirator 1 would be the supplier of naltrexone pellets, and that Customer Clinic 2 had "agreed to meet certain minimum milestones" regarding the purchase of naltrexone pellets.

Overt Act No. 31:   On or about March 19, 2015, Co-Conspirator 1 emailed defendant GOOBERMAN and asked what "exclusive" referred to with respect to Customer Clinic 2 and whether Co-Conspirator 1 could supply other clinics in the United States.

Overt Act No. 32:   On or about March 19, 2015, defendant GOOBERMAN emailed Co-Conspirator 1 and indicated, among other things, that Co-Conspirator 1 could only supply naltrexone pellets provided by defendant GOOBERMAN to Customer Clinic 2 in the United States.

Overt Act No. 33: On or about March 19, 2015, defendant GOOBERMAN emailed Co-Conspirator 1 and indicated that Customer Clinic 2 "must implant at least 25 per quarter for 2015, then a minimum of 25 a month for 2016 then at least 100 the first quarter of 2017."

Overt Act No. 34: On or about March 25, 2015, defendant GOOBERMAN emailed Co-Conspirator 1 and asked Co-Conspirator 1 to keep him informed of his communications with Customer Clinic 2, including the price list that Co-Conspirator 1 sent to Customer Clinic 2 and what Customer Clinic 2 was ordering, as well as to copy defendant GOOBERMAN on emails with Customer Clinic 2.

Delivery of Naltrexone Pellets in April 2015

Overt Act No. 35: On or about March 25, 2015, Co-Conspirator 1 emailed defendants GOOBERMAN and TICKNER, inquiring about the possibility of receiving various products, including 300 naltrexone pellets.

Overt Act No. 36: On or about April 1, 2015, defendant TICKNER emailed Co-Conspirator 1, stating that she may not have time to have the naltrexone pellets "irradiated" and asking whether Co-Conspirator 1 would have any problem getting the naltrexone pellets "sterilized."

Overt Act No. 37: On or about April 1, 2015, Co-Conspirator 1 emailed defendant TICKNER and responded that "irradiation is no problem," and Co-Conspirator 1 also asked defendant TICKNER whether she had any stock of 500 mg and 800 mg naltrexone pellets.

Overt Act No. 38: On or about April 2, 2015, defendant TICKNER emailed Co-Conspirator 1 and indicated that she had 500 mg naltrexone pellets in stock, but not 800 mg naltrexone pellets.

Overt Act No. 39: On or about April 14, 2015, defendant TICKNER emailed Co-Conspirator 1, stating that she was sending one

14

1  FedEx package inside another and asking Co-Conspirator 1 to "tell

2  your friend that there are no labels on the packs . . . ."

3      Overt Act No. 40:   On or about April 14, 2015, defendant

4  TICKNER emailed Co-Conspirator 1 and informed Co-Conspirator 1 that

5  the package would arrive on Thursday.

6      Overt Act No. 41:   On or about April 16, 2015, Co-Conspirator 3

7  emailed Co-Conspirator 1 and informed Co-Conspirator 1 that the

8  package had just arrived.

9      Overt Act No. 42:   On or about April 23, 2015, defendant

10  TICKNER emailed Co-Conspirator 1 and defendant GOOBERMAN a running

11  inventory for the period May 2008 to April 22, 2015, that reflected

12  the naltrexone products and disulfiram products that defendants

13  GOOBERMAN and TICKNER had provided to Co-Conspirator 1 as well as the

14  amount of money Co-Conspirator 1 had paid to defendants GOOBERMAN and

15  TICKNER for the naltrexone and disulfiram products that Co-

16  Conspirator 1 sold.

17  Discussion of Codes Used to Ship Naltrexone Products

18      Overt Act No. 43:   On or about October 16, 2015, Co-Conspirator

19  1 emailed Co-Conspirator 2, stating, "Can you please find out about

20  the two harmonisation codes that we use for implants and injections.

21  I need to know exactly what the harmonisation codes mean, what

22  category of product they refer to.  Is it possible to get a copy of

23  the harmonisation code book or download it from the internet."

24      Overt Act No. 44:   On or about October 22, 2015, Co-Conspirator

25  2 emailed Co-Conspirator 1 the following message:

26      "Implants (Plastic beads in plastic tubes) - 39172200

27      Injection (small glass bottles) - 70109030"

28

Delivery of Naltrexone Pellets in October 2015

Overt Act No. 45:   On or about October 5, 2015, Co-Conspirator 1 emailed defendants GOOBERMAN and TICKNER and asked about the availability of 800 mg naltrexone pellets.

Overt Act No. 46:   On or about October 6, 2015, defendant GOOBERMAN emailed Co-Conspirator 1 and responded that defendant TICKNER was checking on the availability of 800 mg naltrexone pellets.

Overt Act No. 47:   On or about October 7, 2015, defendant TICKNER emailed Co-Conspirator 1 and asked whether Co-Conspirator 1 could get the naltrexone pellets sterilized and indicated that she could probably send 400-500 naltrexone pellets.

Overt Act No. 48:   On or about October 7, 2015, Co-Conspirator 1 emailed defendant TICKNER and asked how long it would take for the naltrexone pellets to be ready without sterilization and with sterilization.

Overt Act No. 49:   On or about October 8, 2015, Co-Conspirator 1 emailed defendants GOOBERMAN and TICKNER and asked defendant TICKNER to confirm whether she had any irradiated 800 mg naltrexone pellets and how long it would take to have available any irradiated naltrexone pellets or non-irradiated naltrexone pellets.

Overt Act No. 50:   On or about October 8, 2015, Co-Conspirator 1 emailed defendant TICKNER and Co-Conspirator 3 and provided the address for delivery of naltrexone pellets to Co-Conspirator 3.

Overt Act No. 51:   On or about October 13, 2015, defendant TICKNER emailed Co-Conspirators 1 and 3 and informed them that a package containing naltrexone pellets would arrive the next day.

1       Overt Act No. 52:   On or about October 13, 2015, defendant
2   TICKNER attempted to send an email to Co-Conspirator 1, which
3   indicated that the package sent to Co-Conspirator 3 contained 200
4   sterile and 200 non-sterile naltrexone pellets.

5       Overt Act No. 53:   On or about October 14, 2015, Co-Conspirator
6   3 emailed defendant TICKNER and informed defendant TICKNER that the
7   package had been received.

8       Overt Act No. 54:   On or about October 14, 2015, defendant
9   TICKNER emailed Co-Conspirator 3 and stated, among other things,
10  "Wow!  Thank God you got it!!"

11      Overt Act No. 55:   On or about October 15, 2015, Co-Conspirator
12  3 shipped 48 naltrexone pellets, described as "PLASTIC BEADS IN
13  PLASTIC TUBES" and "COSMETIC JEWELLERY" to Co-Conspirator 2.

14      Overt Act No. 56:   On or about October 15, 2015, Co-Conspirator
15  1 emailed Co-Conspirator 2, indicating that Co-Conspirator 3 had sent
16  a shipment of 50 naltrexone pellets to Co-Conspirator 2 and
17  instructing Co-Conspirator 2 on the expiration date and batch number
18  to be used on the labels for those pellets.

19      Overt Act No. 57:   On or about October 15, 2015, Co-Conspirator
20  2 emailed Co-Conspirator 1 and acknowledged the instruction that Co-
21  Conspirator 1 had given regarding the naltrexone pellets sent by Co-
22  Conspirator 3.

23      Overt Act No. 58:   On or about October 18, 2015, Co-Conspirator
24  2 emailed Co-Conspirator 1 and stated that the shipment had arrived,
25  and that it contained only 48 naltrexone pellets.

26      Overt Act No. 59:   On or about October 19, 2015, defendant
27  TICKNER forwarded an email to Co-Conspirator 1 that she previously
28  attempted to send on October 13, 2015, with a subject line that

indicated that 200 sterile and 200 non-sterile naltrexone pellets had been sent to Co-Conspirator 3.

Overt Act No. 60:   On or about October 19, 2015, Co-Conspirator 3 emailed defendant TICKNER and indicated that the package received contained 200 non-sterile naltrexone pellets and only 198 sterile naltrexone pellets.

Overt Act No. 61:   On or about October 20, 2015, defendant TICKNER emailed Co-Conspirators 1 and 3 and apologized for the shortfall of two naltrexone pellets and further stated that she would send out two sterile naltrexone pellets that day.

Overt Act No. 62:   On or about November 6, 2015, Co-Conspirator 3 emailed Co-Conspirator 1 to confirm the information that Co-Conspirator 3 should use to ship 50 naltrexone pellets to Co-Conspirator 2's business address, including a description of the pellets as either "plastic beads in plastic tubes x 50" or as "cosmetic jewellery."

Overt Act No. 63:   On or about November 6, 2015, Co-Conspirator 1 emailed Co-Conspirator 3 and confirmed that the shipping information described in Co-Conspirator 3's email was correct and instructed Co-Conspirator 3 to ship 52 sterile naltrexone pellets using "the UMO DHL account as before."

Overt Act No. 64:   On or about November 6, 2015, Co-Conspirator 3 shipped 52 naltrexone pellets, described as "Plastic beads in plastic tubes x52 Cosmetic Jewellery" to Co-Conspirator 2.

Overt Act No. 65:   On or about November 7, 2015, Co-Conspirator 1 emailed Co-Conspirator 2 and stated that Co-Conspirator 3 had sent 52 naltrexone pellets to Co-Conspirator 2.

1    Overt Act No. 66:   On or about November 8, 2015, Co-Conspirator
2    1 emailed Co-Conspirator 2 and indicated that the package of
3    naltrexone pellets to arrive would need packaging and labeling in the
4    same manner as the previous batch sent by Co-Conspirator 3.

5    Overt Act No. 67:   On or about November 8, 2015, Co-Conspirator
6    2 emailed Co-Conspirator 1 and confirmed that Co-Conspirator 2 had
7    received 52 naltrexone pellets.

8    Overt Act No. 68:   On or about December 14, 2015, Co-
9    Conspirator 3 shipped 100 naltrexone pellets, described as "Plastic
10   beads in plastic tubes" to Co-Conspirator 2 in Hong Kong.

11   Overt Act No. 69:   On or about December 17, 2015, Co-
12   Conspirator 3 shipped 200 naltrexone pellets, described as "Plastic
13   beads in plastic tubes," to Co-Conspirator 2 in Hong Kong.

14   February 2016 Order of Naltrexone Pellets by Customer Clinic 2 –
15   Invoice No. 20160014

16   Overt Act No. 70:   On or about February 14, 2016, defendant
17   GOOBERMAN emailed Co-Conspirator 1 asking if Co-Conspirator 1 could
18   help Customer Clinic 2 obtain 25 naltrexone pellets.

19   Overt Act No. 71:   On or about February 14, 2016, Co-
20   Conspirator 1 responded to defendant GOOBERMAN's email indicating
21   that he could supply the naltrexone pellets, stating, "Sure.  They
22   just have to put an order in."

23   Overt Act No. 72:   On or about February 17, 2016, after
24   receiving an order by email from an executive at Customer Clinic 2,
25   Co-Conspirator 1 prepared Invoice No. 20160014 for Customer Clinic
26   2's order of 25 naltrexone pellets for a total cost of approximately
27   $5,969.66, and sent the invoice to an executive of Customer Clinic 2.

28

Overt Act No. 73:   On or about February 20, 2016, Co-Conspirator 1 emailed an executive of Customer Clinic 2 indicating that he was awaiting final payment for the order of naltrexone pellets.

Overt Act No. 74:   On or about February 25, 2016, Co-Conspirator 4 shipped 25 naltrexone pellets, described as "Plastic Beads in Plastic Tubes" with HTSA code "39172200," to Customer Clinic 2, in Toluca Lake, California.

March 2016 Order by Customer Clinic 2 – Invoice No. 20160019

Overt Act No. 75:   On or about March 2, 2016, after receiving an inquiry from an executive of Customer Clinic 2 about ordering 25 naltrexone pellets and another product, Co-Conspirator 1 emailed an executive of Customer Clinic 2 an invoice for 25 naltrexone pellets and another product.

Overt Act No. 76:   On or about March 23, 2016, Co-Conspirator 1 caused Co-Conspirator 1's employee to email an executive of Customer Clinic 2 a revised invoice for 25 naltrexone pellets and another product.

Overt Act No. 77:   On or about March 23, 2016, Co-Conspirator 1 caused Co-Conspirator 1's employee to email Co-Conspirators 2 and 4 with instructions to ship 25 naltrexone pellets and another product to Customer Clinic 2, with the note "Please remember harmonisation code."

Overt Act No. 78:   On or about March 24, 2016, Co-Conspirator 4 shipped 25 naltrexone pellets, described as "Plastic beads in plastic tubes," with HTSA code 39172200, to Customer Clinic 2 in Toluca Lake, California.

Receipt of Payment for February and March 2016 Sales

Overt Act No. 79:   On or about June 10, 2016, defendant TICKNER emailed Co-Conspirator 1, stating, "Our babies need shoes. . . . " and provided a running inventory for the period May 2008 to April 13, 2016, that reflected the naltrexone products and disulfiram products that defendants GOOBERMAN and TICKNER had provided to Co-Conspirator 1 as well as the amount of money Co-Conspirator 1 had paid to defendants GOOBERMAN and TICKNER for the naltrexone and disulfiram products that Co-Conspirator 1 sold.

Overt Act No. 80:   On or about June 30, 2016, after not receiving payment from Co-Conspirator 1, defendant TICKNER emailed Co-Conspirator 1, stating, "Remember me? I am the pain in your neck!!"

Overt Act No. 81:   On or about August 4, 2016, defendant GOOBERMAN emailed Co-Conspirator 1, copying defendant TICKNER, to ask for a payment if Co-Conspirator 1 could make one.

Overt Act No. 82:   On or about August 10, 2016, Co-Conspirator 1 emailed defendants GOOBERMAN and TICKNER a summary of his sales for the months of February through June 2016 of naltrexone and disulfiram pellets obtained from defendants GOOBERMAN and TICKNER and authorized defendant GOOBERMAN to run a charge of $44,790 on Co-Conspirator 1's credit card.

Overt Act No. 83:   On or about August 15, 2016, defendant TICKNER emailed Co-Conspirator 1 a running inventory for the period of May 2008 to August 11, 2016, that reflected the naltrexone products and disulfiram products that defendants GOOBERMAN and TICKNER had provided to Co-Conspirator 1 as well as the amount of money Co-Conspirator 1 had paid to defendants GOOBERMAN and TICKNER

1  for the naltrexone and disulfiram products that Co-Conspirator 1
2  sold.
3  Delivery of Naltrexone Pellets in April 2016
4      Overt Act No. 84:   On or about April 1, 2016, Co-Conspirator 1
5  emailed defendants GOOBERMAN and TICKNER about obtaining more
6  naltrexone pellets, stating, "I am planning to come to USA for ASAM.
7  How many implants can you let me have.   Packaged but not irradiated
8  will be fine.   How many can you let me have?"
9      Overt Act No. 85:   On or about April 2, 2016, defendant TICKNER
10  responded to Co-Conspirator 1's email regarding the request for
11  naltrexone pellets, stating, "500 nonsterile."
12      Overt Act No. 86:   On or about April 2, 2016, Co-Conspirator 1
13  responded to defendant TICKNER's email, stating, "Perfect or more if
14  you have them.   Preferably without any marking on the packaging."
15      Overt Act No. 87:   On or about April 13, 2016, Co-Conspirator 1
16  arrived in the United States after a flight from Hong Kong.
17      Overt Act No. 88:   On or about April 18, 2016, Co-Conspirator 1
18  departed the United States on a flight bound for Hong Kong with
19  naltrexone pellets.
20  November 2016 Order of Liquid Naltrexone by Customer Clinic 1 –
21  Invoice No. 2016091/093
22      Overt Act No. 89:   On or about November 16, 2016, after
23  receiving an order for 10 units of liquid naltrexone from an
24  executive of Customer Clinic 1, Co-Conspirator 1 emailed an executive
25  of Customer Clinic 1 an invoice and stated, "Thanks for your order.
26  Please find attached invoice with new price list."
27
28

1    Overt Act No. 90:   On or about November 16, 2016, Co-
2    Conspirator 1 emailed an executive of Customer Clinic 1 with a
3    revised invoice number for the liquid naltrexone order.
4    Overt Act No. 91:   On or about November 20, 2016, after
5    receiving an email from an executive of Customer Clinic 1 that
6    referred to the liquid naltrexone ordered as Vivitrol, Co-Conspirator
7    1 emailed the executive of Customer Clinic 1 and stated, "Please be
8    quite clear that we do no sell Vivitrol, which is a brand of depot
9    Naltrexone.  Please do not refer to our product which is generic
10   Naltrexone as Vivitrol."
11   Overt Act No. 92:   On or about November 20, 2016, Co-
12   Conspirator 1 emailed Co-Conspirator 4 with instructions to ship 10
13   units of liquid naltrexone to Customer Clinic 1, noting "Please
14   remember to ship with harmonisation code for 'small glass bottles'."
15   Overt Act No. 93:   On or about November 21, 2016, after payment
16   for 10 units of liquid naltrexone had been received from Customer
17   Clinic 1, Co-Conspirator 4 shipped 10 units of liquid naltrexone,
18   described as "Small Glass Bottles," with HTSA code 70109030, to
19   Customer Clinic 1, in Corona del Mar, California.
20   Receipt of Payment for October to December 2016 Sales
21   Overt Act No. 94:   On or about March 28, 2017, defendant
22   TICKNER emailed Co-Conspirator 1 and asked whether Co-Conspirator 1
23   was ready to make a payment for sales made from October to December.
24   Overt Act No. 95:   On or about March 28, 2017, Co-Conspirator 1
25   emailed defendant TICKNER and stated, "Let me check.  Thanks."
26   Overt Act No. 96:   On or about April 25, 2017, defendant
27   TICKNER emailed Co-Conspirator 1 and asked, "Now?"
28

1     Overt Act No. 97:   On or about June 6, 2017, defendant TICKNER
2   emailed Co-Conspirator 1 and, among other things, asked about
3   receiving payment for sales made by Co-Conspirator 1, stating, "I
4   really hate to bug you about this, but I was just wondering if you
5   could send us a little something, please."

6     Overt Act No. 98:   On or about June 6, 2017, Co-Conspirator 3
7   responded to defendant TICKNER's email and stated, among other
8   things, that they would arrange to make a payment and would notify
9   defendant TICKNER once the payment had gone through.

10    Overt Act No. 99:   On or about June 26, 2017, Co-Conspirator 1
11  caused payment in the amount of $12,795 to be made to defendants
12  GOOBERMAN and TICKNER for sales made by Co-Conspirator 1.

13  February 2017 Order of Liquid Naltrexone by Customer Clinic 1 –
14  Invoice No. 2017008

15    Overt Act No. 100:   On or about February 1, 2017, after
16  receiving a request from an executive of Customer Clinic 1 to
17  purchase 10 units of liquid naltrexone, which the executive described
18  as "Vivitrol," Co-Conspirator 1 emailed the executive of Customer
19  Clinic 1 and stated, "I do not sell Vivitrol.  It is illegal to do
20  so.  Please revise your email."

21    Overt Act No. 101:   On or about February 1, 2017, after an
22  executive of Customer Clinic 1 clarified that he wished to purchase
23  liquid naltrexone, Co-Conspirator 1 emailed Co-Conspirators 2 and 4
24  and instructed Co-Conspirator 4 to ship 10 units of liquid naltrexone
25  to Customer Clinic 1, noting "Please remember to put the
26  harmonisation code."

27    Overt Act No. 102:   On or about February 2, 2017, Co-Conspirator
28  4 shipped 10 units of liquid naltrexone, described as "Small Glass

24

1  Bottles," with HTSA code 70109030, to Customer Clinic 1 in Corona Del

2  Mar, California.

3  April 2017 Order of Liquid Naltrexone by Customer Clinic 1 – Invoice

4  No. 2017024

5      Overt Act No. 103:  On or about April 18, 2017, after receiving

6  an order for 10 units of liquid naltrexone from Customer Clinic 1,

7  Co-Conspirator 1 emailed Co-Conspirators 2 and 4 and instructed Co-

8  Conspirator 4 to ship 10 units of liquid naltrexone to Customer

9  Clinic 1, noting, "Please remember the harmonisation code."

10      Overt Act No. 104:  On or about April 19, 2017, Co-Conspirator 4

11  shipped 10 units of liquid naltrexone, described as "Small Glass

12  Bottles," with HTSA code 70109030, Customer Clinic 1 in Corona Del

13  Mar, California.

14  Delivery of Gooberman Naltrexone Products in May 2017

15      Overt Act No. 105:  On or about May 6, 2017, Co-Conspirator 3,

16  acting on behalf of Co-Conspirator 1 and using Co-Conspirator 1's

17  email address, emailed defendants GOOBERMAN and TICKNER and requested

18  to have 200 units of liquid naltrexone and other product sent to Co-

19  Conspirator 1's attention at 73223 Tumbleweed Lane, Apt. 9, Palm

20  Desert, California ("the Palm Desert location").

21      Overt Act No. 106:  On or about May 6, 2017, defendant GOOBERMAN

22  sent an email to Co-Conspirator 1's email address and to defendant

23  TICKNER to inquire who would be at the Palm Desert location and

24  further asking, "Have they been properly instructed in how to handle

25  the packaging markings etc.  Why is [Co-Conspirator 1] comfortable

26  with this.  I'm a little reticent."

27      Overt Act No. 107:  On or about May 7, 2017, Co-Conspirator 3,

28  acting on behalf of Co-Conspirator 1 and using Co-Conspirator 1's

email address, emailed defendants GOOBERMAN and TICKNER and indicated that the person located at the Palm Desert location ("the Palm Desert resident") had received and sent naltrexone product to Hong Kong at least twice before.

Overt Act No. 108:  On or about May 7, 2017, defendant GOOBERMAN emailed Co-Conspirator 3 and defendant TICKNER and indicated his consent to having the liquid naltrexone and naltrexone pellets sent to the Palm Desert location.

Overt Act No. 109:  On or about May 8, 2017, defendant TICKNER emailed Co-Conspirator 3 at Co-Conspirator 1's email address and indicated that the liquid naltrexone was being sent out by FedEx that day.

Overt Act No. 110:  On or about May 9, 2017, Co-Conspirator 3 emailed defendant TICKNER and thanked defendant TICKNER for sending the liquid naltrexone and also stated that Co-Conspirator 3 would notify the Palm Desert resident about the shipment.

Overt Act No. 111:  On or about May 9, 2017, Co-Conspirator 3 emailed the Palm Desert resident, copying Co-Conspirator 1, and, among other things, instructed the Palm Desert resident that when shipping the liquid naltrexone to Co-Conspirator 1, the units of liquid naltrexone were to be described as "plastic beads in plastic tubes x 50" and as "cosmetic jewellery."

Overt Act No. 112:  On or about May 8, 2017, defendant TICKNER shipped 200 units of liquid naltrexone from New Jersey to the Palm Desert location.

Overt Act No. 113:  On or about May 10, 2017, defendant TICKNER emailed Co-Conspirator 3 at Co-Conspirator 1's email address and

1 │ asked to confirm that the Palm Desert resident received the

2 │ naltrexone shipment at the Palm Desert location.

3 │     Overt Act No. 114:  On or about May 22, 2017, Co-Conspirators 1

4 │ and 3 caused 200 units of liquid naltrexone, described as "Plastic

5 │ Beads in plastic containers," to be shipped from the Palm Desert

6 │ location to Co-Conspirator 1 in Hong Kong.

7 │     Overt Act No. 115:  On or about May 25, 2017, Co-Conspirator 3,

8 │ using Co-Conspirator 1's email address, emailed defendant TICKNER

9 │ asking for confirmation of what was sent to the Palm Desert location

10 │ so that Co-Conspirator 3 could reconcile it with what was received in

11 │ Hong Kong.

12 │     Overt Act No. 116:  On or about May 25, 2017, defendant TICKNER

13 │ emailed Co-Conspirator 3, at Co-Conspirator 1's email address, a

14 │ running inventory for the period May 2008 to May 17, 2017, that

15 │ reflected the naltrexone products and disulfiram products that

16 │ defendants GOOBERMAN and TICKNER had provided to Co-Conspirator 1,

17 │ and indicated that the last three entries on the running inventory

18 │ were sent to the Palm Desert location.

19 │ October 2017 Order of Liquid Naltrexone by Customer Clinic 3 –

20 │ Invoice No. 2017074

21 │     Overt Act No. 117:  On or about October 23, 2017, Co-Conspirator

22 │ 1 emailed Co-Conspirator 4 and instructed Co-Conspirator 4 to arrange

23 │ to ship 10 units of liquid naltrexone to Customer Clinic 3 in Laguna

24 │ Beach, California, noting "Please remember harmonization code."

25 │     Overt Act No. 118:  On or about October 24, 2017, Co-Conspirator

26 │ 4 emailed an executive of Customer Clinic 3 and Co-Conspirator 1

27 │ indicating that the liquid naltrexone destined for Customer Clinic 3

28 │ had been picked up by DHL.

1      Overt Act No. 119:  On or about October 24, 2017, Co-Conspirator

2   4 shipped 10 units of liquid naltrexone to Customer Clinic 3 in

3   Laguna Beach, California.

COUNTS TWO THROUGH SEVEN

[21 U.S.C. §§ 331(d), 355(a), 333(a)(2); 18 U.S.C. §§ 2(a), (b)]

[ALL DEFENDANTS]

Beginning on an unknown date and continuing until the dates listed below, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants LANCE L. GOOBERMAN and SUSAN TICKNER, knowingly and with intent to defraud, introduced, aided and abetted the introduction of, and willfully caused the introduction of, the new drugs listed below into interstate commerce by sending them to an individual in Hong Kong, who in turn shipped the drugs to the counties listed below, in violation of the Title 21, United States Code, Section 355(a).  The drugs listed below each constituted a new drug that did not have an NDA or ANDA approved by the FDA.

| COUNT | DATE | COUNTY | Drugs |
|---|---|---|---|
| TWO | 3/9/2015 | Orange | Naltrexone pellets |
| THREE | 2/25/2016 | Los Angeles | Naltrexone pellets |
| FOUR | 11/21/2016 | Orange | Liquid naltrexone |
| FIVE | 2/2/2017 | Orange | Liquid naltrexone |
| SIX | 4/19/2017 | Orange | Liquid naltrexone |
| SEVEN | 10/24/2017 | Orange | Liquid naltrexone |

COUNT EIGHT

[18 U.S.C. §§ 545, 2(a), (b)]

[ALL DEFENDANTS]

On or about March 24, 2016, in Los Angeles County, within the Central District of California, and elsewhere, defendants LANCE L. GOOBERMAN and SUSAN TICKNER knowingly and fraudulently imported and brought, aided and abetted the importation of, and willfully caused to be imported and brought, merchandise, namely naltrexone pellets, into the United States, contrary to law, that is, by: (1) introducing into interstate commerce a prescription drug that was misbranded, in violation of Title 21, United States Code, Sections 331(a), 352, 353(b)(4); and (2) introducing into interstate commerce a new drug that did not have an NDA or ANDA approved by the FDA, in violation of Title 21, United States Code, Sections 331(d), 355(a).

COUNTS NINE THROUGH ELEVEN

[21 U.S.C. §§ 331(d), 355(a), 333(a)(2); 18 U.S.C. § 2(b)]

[ALL DEFENDANTS]

On or about the following dates, in Riverside County, within the Central District of California, and elsewhere, defendants LANCE L. GOOBERMAN and SUSAN TICKNER knowingly and with intent to defraud, introduced, and willfully caused to be introduced, the drugs listed below into interstate commerce, namely, from New Jersey to Riverside County, each of which constituted a new drug that did not have an NDA or ANDA approved by the FDA, in violation of Title 21, United States Code, Section 355(a).

| COUNT | DATE | NEW DRUGS |
|-------|------|-----------|
| NINE | 5/8/2017 | Liquid naltrexone |
| TEN | 5/8/2017 | Liquid naltrexone |
| ELEVEN | 5/17/2017 | Naltrexone pellets |

COUNT TWELVE

[18 U.S.C. §§ 554, 2(a), (b)]

[ALL DEFENDANTS]

On or about May 22, 2017, in Riverside County, within the
Central District of California, and elsewhere, defendants LANCE L.
GOOBERMAN and SUSAN TICKNER knowingly and fraudulently exported and
sent, aided and abetted the exportation of, and willfully caused to
be exported and sent, merchandise, namely, liquid naltrexone, out of
the United States, contrary to law, by: (1) introducing into
interstate and foreign commerce a prescription drug that was
misbranded, in violation of Title 21, United States Code, Sections
331(a), 352, 353(b)(4); and (2) introducing into interstate and
foreign commerce a new drug that did not have an NDA or ANDA

//

//

//

approved by the FDA, in violation of Title 21, United States Code, Sections 331(d), 355(a).

A TRUE BILL

_/S/_____
Foreperson

NICOLA T. HANNA
United States Attorney

*Brandon Fox*

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

JOSEPH O. JOHNS
Assistant United States Attorney
Chief, Environmental and
Community Safety Crimes Section

MARK A. WILLIAMS
Assistant United States Attorney
Deputy Chief, Environmental and
Community Safety Crimes Section

HEATHER C. GORMAN
DENNIS MITCHELL
Assistant United States Attorneys
Environmental and Community
Safety Crimes Section